# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**RANDY L. McGUIRE**
        **Plaintiff,**

        **v.**                                                                       **Case No. 17-C-696**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

## DECISION AND ORDER

Plaintiff Randy McGuire applied for social security disability insurance benefits, alleging that he became disabled as of August 28, 2011 due to polycystic kidney disease ("PKD"). Because plaintiff's "insured status" ended on September 30, 2011, he had to establish disability prior to that date. The Administrative Law Judge ("ALJ") assigned to the case concluded that during the relevant time plaintiff retained the ability to perform a range of medium work, allowing him to do a number of jobs in the economy.

In this action for judicial review, plaintiff argues that the ALJ provided an insufficient explanation for rejecting the opinion of his treating physician, who found plaintiff disabled during the relevant time. I agree that the ALJ's one-sentence rejection of the treating source report cannot be upheld and thus remand for further proceedings.

## I. BACKGROUND

### A. Medical Evidence

On August 28, 2011, plaintiff went to the emergency room following a syncopal episode. (Tr. at 294.) Doctors suspected cardiac arrhythmia or vasovagal syncope, possibly due to

dehydration. (Tr. at 295.) They treated plaintiff with IV fluids and released him. (Tr. at 295-96.)

Plaintiff returned to the ER on September 1, 2011, complaining of left-side flank pain of ten days' duration, which significantly worsened that day. (Tr. at 297.) Doctors provided IV pain medications and obtained a CT scan, which revealed numerous bilateral renal cysts with two hemorrhagic cysts on the left side. Plaintiff was admitted (Tr. at 298), and on September 2 consulted with Dr. Logan Elangovan, a nephrologist, who diagnosed PKD based on plaintiff's presentation and the imaging. Plaintiff was discharged on oral pain medications, with close follow up as an out-patient. (Tr. at 283, 285, 291-92, 306.)

Plaintiff was admitted to the hospital yet again on September 4, 2011, for confusional episodes. (Tr. at 301, 308.) Doctors ordered a brain CT and echocardiogram, which were normal. (Tr. at 303, 309, 326). Plaintiff discharged on September 6, with a diagnosis of syncope, probably related to pain medication and hypoxia. (Tr. at 311-12.)

On September 16, 2011, plaintiff saw Dr. James Chapman, a primary care physician. (Tr. at 333.) He reported still having some pain, with over-the-counter medications not providing enough benefit. Dr. Chapman prescribed hydrocodone. Plaintiff was to follow up with urology and nephrology. (Tr. at 335.)

On September 28, 2011, plaintiff saw Dr. Brian Butler, urologist, who recommended a repeat CT scan in two months to check for resolution of the hemorrhagic cysts. He further recommended continued aggressive management of plaintiff's blood pressure and preservation of renal function long-term. (Tr. at 458.)

On October 3, 2011, plaintiff followed up with Dr. Elangovan, who noted "pain control adequate." (Tr. at 281.) On December 21, Dr. Butler noted, "Looks well, feels well. He is now

2

complaining of intermittent left flank pain[.]" (Tr. at 323, 474.) A CT scan taken on that date revealed interval growth of one cyst but no definite enhancement. "Otherwise, stable polycystic disease[.]" (Tr. at 317-18.) On January 5, 2012, Dr. Butler noted, "He's clinically asymptotic at this time." (Tr. at 459.) He recommended a follow up CT in three to six months. (Tr. at 459.)

On January 23, 2012, plaintiff told Dr. Elangovan that he still had left sided flank pain, especially with activity. (Tr. at 279.) On March 23, plaintiff advised Dr. Chapman that he was still having some intermittent pain issues. (Tr. at 345.) Dr. Chapman stressed the importance of following up with his specialists. "However, his symptoms have gradually improved. He apparently had stopped working as a truck driver because of concerns about the cyst. I told him I thought it would be safe for him to return to work but did ask him to verify this with his specialists." (Tr. at 346.)

Plaintiff returned to Dr. Chapman on April 23, 2012, reporting a prominent lump in his mid upper abdomen, otherwise asymptomatic. He used Vicodin as needed for pain, although less than he initially required. (Tr. at 358.) Plaintiff underwent a repeat CT scan on May 2, which revealed stable left renal cyst without evidence of enhancement and no acute findings. (Tr. at 385-86, 469-70.)

On August 18, 2012, plaintiff followed up with Dr. Elangovan, reporting significant pain in the kidney area from simple activities like driving a truck, sitting, and walking fast. (Tr. at 264, 289.) On March 23, 2013, he reported continued significant pain related to PKD. (Tr. at 267, 286.) On March 26, he told Dr. Chapman that he still had left sided pain from the large cyst. He used Vicodin sparingly for this pain. (Tr. at 365.)

A repeat CT scan on May 1, 2013, revealed no interval change in the numerous cysts.

3

(Tr. at 390, 466-67.) On May 10, plaintiff followed up with Dr. Butler, who noted: "He is truly asymptomatic. CT shows no evidence for changes in his cysts over time." (Tr. at 457.) He was to follow up in two years. (Tr. at 457.)

On September 21, 2013, plaintiff saw Dr. Elangovan, reporting significant flank pain, which limited his lifestyle. He was not even able to stretch to reach above his head. (Tr. at 478.) Dr. Elangovan contacted Dr. Butler about aspirating the cysts on the left to see if that would help with pain. (Tr. at 480.)

Plaintiff saw Dr. Butler on October 8, 2013, for evaluation of left-sided flank pain. Dr. Butler offered physical therapy or aspiration, and plaintiff chose aspiration. (Tr. at 489.) Plaintiff followed up with Dr. Butler on February 3, 2014, doing extremely well following the aspiration. He was able to lift his arm over his head with minimal to no pain. (Tr. at 490-91.)

On March 17, 2014, plaintiff advised Dr. Elangovan that his significant flank pain improved with the cyst aspiration, although he still had some dull pain. (Tr. at 494.) Plaintiff returned to Dr. Elangovan on September 15, doing well, with no changes. He still had some flank discomfort, but the pain had definitely improved with cyst aspiration. (Tr. at 497.) On March 16, 2015, plaintiff advised that he seemed to be experiencing more pain, and Dr. Elangovan noted that he may need to be referred back to Dr. Butler for re-imaging if the pain became hard to medically manage. He was to follow up in six months. (Tr. at 502.)

On November 9, 2015, Dr. Elangovan prepared a letter stating:

I have treated Mr. McGuire for polycystic kidney disease since 2011. From my experience in treating patients with this disease, it is my medical opinion that Mr. McGuire has been disabled since September of 2011, when he was hospitalized for a ruptured cyst.

His disease has caused him severe pain and the medication options to control his pain and related symptoms are limited due to his Chronic Kidney Disease and

4

> the risk of further damaging his kidneys with their use. As a result, returning to work would cause further aggravation of his symptoms and pain that would result from prolonged sitting, standing, walking and prolonged physical activity. Additionally, like many people who suffer from chronic kidney disease, Mr. McGuire experiences increased frequency which causes him to use the bathroom frequently. If Mr. McGuire's kidneys continue to get worse and his Chronic Kidney Disease progresses, he will need kidney dialysis in the future.

(Tr. at 515.)

**B.    Procedural History**

Plaintiff applied for benefits in April 2013. (Tr. at 156.) He reported past employment as a truck driver (Tr. at 174), indicating that he stopped working in June 2008 because his employer had no work available (Tr. at 173). In a function report, plaintiff listed activities including preparing simple meals, doing some housework, light grocery shopping, driving a car, reading, and watching TV. (Tr. at 186-88.) He avoided activities that involved sitting or standing for great lengths of time. (Tr. at 189.)

The agency denied the application initially in August 2013 (Tr. at 92), based on the review of Mina Khorshidi, M.D., who concluded that plaintiff's impairment did not meet the durational requirement. (Tr. at 76.) Plaintiff sought reconsideration, but the agency maintained the denial in October 2013 (Tr. at 100) based on the review of Janis Byrd, M.D., who determined that plaintiff could perform medium work. (Tr. at 88-89.)

Plaintiff requested a hearing (Tr. at 109), and on November 6, 2015, he appeared with counsel before an ALJ. The ALJ also summoned a vocational expert ("VE"). (Tr. at 30.)

Plaintiff testified that he previously worked as a truck driver delivering mattresses. (Tr. at 38.) He stopped working in 2008 because there was not work available with his employer. (Tr. at 41.) He did apply for truck driving jobs after that but was not hired. (Tr. at 40.) Asked why he could not work in August/September 2011, plaintiff referred to back problems and pain

5

in his kidneys due to the cysts. (Tr. at 41-42.) He testified that his condition had worsened and his activities were more limited now. (Tr. at 44-45, 48, 51.) Asked if he could have worked as a truck driver if offered a job in 2011, plaintiff testified that he would have taken the job but did not know if he would pass the physical. (Tr. at 46.)

The VE classified plaintiff's past job as a truck driver as semi-skilled, medium to heavy work. (Tr. at 61.) The ALJ then asked a hypothetical question assuming a person of plaintiff's age, education, and experience, capable of medium work, with no climbing of ladders, ropes, or scaffolding, and off task up to 5% of the workday in addition to regular breaks. The VE testified that plaintiff's past work would involve climbing, and one could not be off task 5% of the time and still drive a truck. (Tr. at 62.) However, the person could perform a considerable number of other jobs, such as hand packager, floor waxer, and linen clerk. (Tr. at 63.)

On December 24, 2015, the ALJ issued an unfavorable decision. (Tr. at 16.) The ALJ determined that plaintiff had not engaged in substantial gainful activity from August 28, 2011, the alleged onset date, through September 30, 2011, the date last insured; that he suffered from the severe impairments of polycystic kidney disease, hypertension, and hyperlipidemia, none of which qualified as conclusively disabling under agency regulations; that despite these impairments he retained the residual functional capacity ("RFC") to perform medium work with no climbing of ladders, ropes, and scaffolds; and that he could given this RFC perform a significant number of jobs, as identified by the VE. (Tr. at 21-24.)

The ALJ stated that plaintiff received limited medical treatment for his impairments during the relevant time period. He reported a syncopal incident on August 28, 2011. He then experienced abdominal/left flank pain due to kidney disease and cyst rupture in September 2011 for which, after the initial period of attention, he was given medication to be used

6

sparingly. After the date last insured, he reported adequate pain control and denied fatigue in November 2011, was noted to look and feel well in December 2011, and found to be improved and advised it was safe to return to truck driving in March 2012. Imaging studies in August and September 2011 showed minimal heart and lung changes, and plaintiff had a normal echocardiogram in October 2011. (Tr. at 22.)

The ALJ further noted that plaintiff's statements did not support disability as of the alleged onset date. Plaintiff testified at the hearing that his condition was currently worse, and that he was more active in 2011. This was, the ALJ concluded, consistent with plaintiff's 2013 application materials reporting the ability to care for personal needs, prepare simple foods, perform basic household tasks, drive a car, shop, read, and watch TV. Plaintiff also testified that he previously looked for other truck driving jobs but was not hired. (Tr. at 23.)

Based on this evidence, the ALJ rejected plaintiff's subjective allegations of debilitating symptoms during the period at issue. "The claimant may have deteriorated over time and be less able to function now, but the evidence of record does not reflect the degree of inability alleged as of the date last insured." (Tr. at 23.)

The ALJ gave "some weight" to the opinion of agency consultant Dr. Byrd that plaintiff could perform medium work, adding further limitations after reviewing all the evidence and the hearing testimony. "The undersigned considered the statement provided by Logan Elangovan, M.D. (Exhibit 9F), but finds the contemporaneous objective and other evidence provided more persuasive as to the claimant's actual condition during the period in question." (Tr. at 23.)

On March 20, 2017, the Appeals Council denied review of the ALJ's decision. (Tr. at 1.) This action followed

.

7

## II. STANDARD OF REVIEW

The court reviews an ALJ's decision to determine whether it applies the correct legal standards and is supported by "substantial evidence." Summers v. Berryhill, 864 F.3d 523, 526 (7th Cir. 2017). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that the court scours the record for supportive evidence or conjures up reasons to uphold the decision. Moon v. Colvin, 763 F.3d 718, 721 (7th Cir. 2014). Rather, the ALJ must identify the relevant evidence, building a logical bridge between that evidence and the ultimate determination, id., and the court's review is limited to the reasons he provided, see, e.g., Meuser v. Colvin, 838 F.3d 905, 911 (7th Cir. 2016) (citing SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943)). If the decision lacks an adequate discussion of the issues, it will be remanded. Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009).

## III. DISCUSSION

Plaintiff argues that the ALJ failed to provide a valid basis for disregarding the opinion of Dr. Elangovan, his treating nephrologist. A treating physician's opinion is entitled to "controlling weight" if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. Stage v. Colvin, 812 F.3d 1121, 1126 (7th Cir. 2016). If the opinion does not meet the test for controlling weight, the ALJ must decide what other weight it does deserve, considering the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion.

Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010). The ALJ must offer good reasons for discounting the opinion of a treating physician. Israel v. Colvin, 840 F.3d 432, 437 (7th Cir. 2016).[1]

The ALJ's one-sentence discussion of Dr. Elangovan's report fails to satisfy these standards. (Tr. at 23, "The [ALJ] considered the statement provided by Logan Elangovan, M.D. (Exhibit 9F), but finds the contemporaneous objective and other evidence provided more persuasive as to the claimant's actual condition during the period in question.".) The ALJ obviously declined to give the report controlling weight, but he failed explain why he found the report unsupported or inconsistent with the other evidence. Nor did he explain what other weight the report deserved under the regulatory factors. See Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010) ("Even if the ALJ had articulated good reasons for rejecting Dr. Rhoades's opinion, it still would have been necessary to determine what weight his opinion was due under the applicable regulations."). He did not, for instance, discuss the length of the treatment relationship (from September 2011 through November 2015), the frequency with which Dr. Elangovan examined plaintiff, or the doctor's specialty in nephrology.[2]

---

[1] The Commissioner notes that new regulations governing medical opinion evaluation recently went into effect, but those new regulations do not apply here.

[2] The parties dispute whether, under Seventh Circuit case-law, the ALJ is obligated to discuss all of the checklist factors. Compare Campbell, 627 F.3d at 308 ("[T]he decision does not explicitly address the checklist of factors as applied to the medical opinion evidence."), with Henke v. Astrue, 498 Fed. Appx. 636, 640 n.3 (7th Cir. 2012) ("The ALJ did not explicitly weigh every factor while discussing her decision to reject Dr. Preciado's reports, but she did note the lack of medical evidence supporting Dr. Preciado's opinion, and its inconsistency with the rest of the record. This is enough.") (internal citations omitted). I need not resolve the dispute, as the ALJ failed to provide any meaningful explanation here. See Mueller v. Astrue, 493 Fed. Appx. 772, 776 (7th Cir. 2012) ("The ALJ's entire 'analysis' of Dr. Wright's assessment consists of a one-sentence declaration that Dr. Wright's opinion is inconsistent with Mueller's description of his daily activities, the objective medical evidence, the observations and opinions of other

The court reads the ALJ's decision as a whole, Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004), but the earlier portions of his opinion fail to adequately supplement the ALJ's conclusion. The ALJ cited medical records noting improvement and adequate pain control. But at other times plaintiff reported increased pain. The ALJ may not cherry-pick from the record, citing only the evidence that supports his conclusion while ignoring evidence supporting a disability finding. Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011); Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010).

The ALJ cited normal cardiac test results, but plaintiff never claimed a heart problem, and the ALJ overlooked the CT scans showing numerous cystic legions throughout the bilateral kidneys. The ALJ found significant Dr. Chapman's note suggesting plaintiff could return to work, but he omitted Dr. Chapman's qualifier that plaintiff needed to verify this with his specialists. (Tr. at 346.) The ALJ also cited plaintiff's activities, but he failed to explain how these rather minimal tasks (e.g., preparing simple foods, performing basic household tasks, driving a car, watching TV) translated into the ability to perform full-time work at the medium level.[3] See, e.g., Ghiselli v. Colvin, 837 F.3d 771, 778 (7th Cir. 2016) (cautioning that a person's ability to perform daily activities does not necessarily translate to an ability to work full-time).

Finally, the ALJ noted that plaintiff testified that he looked for other truck driving jobs; however, the question at the hearing was whether plaintiff sought work after 2008. (Tr. at 40.) Plaintiff never said he looked for work after August 28, 2011, the alleged onset date. Plaintiff

---

mental-health professionals, and Mueller's ability to perform work in the past with his current mental illnesses and symptoms. This is a conclusion, not a reason (or reasons).").

[3]The ALJ also noted that plaintiff's condition had worsened by the time of the hearing, but even if that was so he did not explain how plaintiff's activities from 2011-13 supported the ability to perform medium work during the relevant period.

10

did say that, if offered a job in 2011, he would have was accepted it, but he doubted he would pass the physical. This was not inconsistent with a disability claim. See Voigt v. Colvin, 781 F.3d 871, 877 (7th Cir. 2015) ("Actually those statements were consistent with his wanting to lead a normal life yet being unable to land a job because he's disabled from gainful employment by a combination of physical and mental problems that a prospective employer would quickly notice.").

The Commissioner notes that the ALJ also relied on the opinion of Dr. Byrd, who opined that plaintiff could perform medium work. See Flener v. Barnhart, 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation."). However, this did not relieve the ALJ of the obligation to explain the weight given the treating source report. See also Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice.").

The Commissioner's remaining arguments are post-hoc, and none are sufficiently compelling to support a finding of harmless error. See Mengistu v. Ashcroft, 355 F.3d 1044, 1047 (7th Cir. 2004). The Commissioner contends that Dr. Elangoven's 2015 opinion was minimally relevant to the time period at issue, but he started treating plaintiff in September 2011, during the relevant period, and thus was well-positioned to address plaintiff's condition at that time.

The Commissioner also contends that because Dr. Elangoven offered only a bare conclusion that plaintiff "has been disabled since September of 2011" his opinion was not entitled to special significance. See 20 C.F.R. § 404.1527(d)(1). But Dr. Elangoven explained

the basis for his opinion in the second paragraph of the letter. In any event, even a bare conclusion cannot be ignored, and if an ALJ cannot determine the basis for a doctor's conclusion he should re-contact the source for clarification. See Garcia v. Colvin, 741 F.3d 758, 760 (7th Cir. 2013).

Finally, the Commissioner notes that Dr. Elangoven did not specify whether plaintiff suffered from urinary frequency during the relevant time period, nor did he recommend specific limitations based on this symptom. Such uncertainties may be clarified on remand; they provide no basis for deeming the report worthless as a matter of law. The same is true of the Commissioner's contention that the doctor failed to provide support for his opinion that plaintiff's pain would preclude prolonged physical activities. Whether the contemporaneous treatment notes and CT scans could provide support for the doctor's opinion is a determination for the ALJ, not the reviewing court. See Summers, 864 F.3d at 526 ("[W]e will not reweigh the evidence or substitute our judgment for that of the ALJ."). The matter must be remanded for reconsideration of Dr. Elangovan's opinion.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is remanded for further proceedings consistent with this decision. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 19th day of March, 2018.

/s Lynn Adelman
LYNN ADELMAN
District Judge